UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

REZA OLANGIAN,
        a/k/a "Raymond Avacian,"
        a/k/a "Ray,"

                *Defendant.*

12 Cr. 798 (LAP)
21 Civ. 8166 (LAP)


## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT REZA OLANGIAN'S MOTION UNDER 28 U.S.C. § 2255


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Madison Reddick Smyser
Assistant United States Attorney
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .................................................................................................................... 2

    I.    Offense Conduct ........................................................................................... 2

    II.    Charges .......................................................................................................... 4

    III.    Trial ................................................................................................................ 4

    IV.    Sentencing ...................................................................................................... 5

    V.    Appeal ........................................................................................................... 6

    VI.    Defendant's Motion Pursuant to 28 U.S.C. § 2255 .................................... 7

ARGUMENT ........................................................................................................................ 8

    I.    Applicable Law ............................................................................................. 8

    II.    Counsel's Preparation for Trial Was Not Ineffective ............................... 10

    III.    Counsel's Decision Not to Seek a Continuance Was Not
          Ineffective ................................................................................................... 12

    IV.    Counsel's Decision Not to Offer Certain Evidence Was Not
          Ineffective ................................................................................................... 14

    V.    Counsel's Decision Not to Argue that There Was Not Proof of
          $15 Million in a Bank Account in Turkey Was Not Ineffective................ 17

    VI.    Counsel's Decision Not to File a Motion *in Limine* to Preclude
          Olangian's Dealings with Weapons-for-Drug Traders Was Not
          Ineffective ................................................................................................... 18

    VII.    Counsel's Decision Not to Object to the Government's Closing
          Was Not Ineffective .................................................................................... 19

CONCLUSION..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Byas v. Keane*, No. 97 Civ. 2789 (SAS), 1999 WL 608787 (S.D.N.Y. Aug. 12, 1999) ............. 10

*Donato v. United States*, No. 09 Civ. 5617 (NGG), 2012 WL 4328368 (E.D.N.Y. Sept. 20, 2012) ....................................................................................................................................... 13

*Dupont v. United States*, 224 F. App'x 80 (2d Cir. 2007) ............................................................ 17

*Greer v. Miller*, 483 U.S. 756 (1987) .......................................................................................... 19

*Hopkins v. Schillinger*, 866 F.2d 1185 (10th Cir. 1989)............................................................. 10

*Mayard v. United States*, No. 16 Cr. 609 (LAP), 2022 WL 992835 (S.D.N.Y. Apr. 1, 2022) ....................................................................................................................................................... 7

*Morris v. Slappy*, 461 U.S. 1 (1983) ........................................................................................... 13

*Newfield v. United States*, 565 F.2d 203 (2d Cir. 1977) ............................................................... 9

*Olangian v. United States*, No. 20-5038, 131 S. Ct. 384 (2020) ................................................... 7

*Rosa v. United States*, 785 F.3d 856 (2d Cir. 2015) ...................................................................... 7

*Rosario v. Bennett*, No. 01 Civ. 7142 (RMB) (AJP), 2002 WL 31852827 (S.D.N.Y. Dec. 20, 2002) ......................................................................................................................... 10, 12

*Smith v. Spisak*, 558 U.S. 139 (2010) ......................................................................................... 18

*Steele v. United States*, No. 02 Cr. 629 (JSR) (AJP), 2005 WL 704868 (S.D.N.Y. Mar. 29, 2005) .......................................................................................................................................... 12

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................................. passim

*Strouse v. Leonardo*, 928 F.2d 548 (2d Cir. 1991) ....................................................................... 9

*United States ex rel. Testamark v. Vincent*, 496 F.2d 641 (2d Cir. 1974) ................................... 10

*United States v. Aguirre*, 912 F.2d 555 (2d Cir. 1990)........................................................... 8, 11

*United States v. Barbarino*, 612 F. App'x 624 (2d Cir. 2015) ................................................... 13

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016)........................................ 20

*United States v. Cohen*, 427 F.3d 164 (2d Cir. 2005)................................................ 9, 20

*United States v. Gaskin*, 364 F.3d 438 (2d Cir. 2004) ................................................. 8

*United States v. Luciano*, 158 F.3d 655 (2d Cir. 1998) .......................................... 11, 17

*United States v. Olangian*, No. 18-1123, 803 F. App'x 536 (2d Cir. 2020)...................... 6, 7, 19

*United States v. Price*, 443 F. App'x 576 (2d Cir. 2011) ............................................. 19

*United States v. Prince*, 110 F.3d 921 (2d Cir. 1997)................................................. 12

*United States v. Reiter*, 897 F.2d 639 (2d Cir. 1990)................................................. 9

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1991)............................................. 9

*United States v. Stantini*, 85 F.3d 9 (2d Cir. 1996).................................................. 10

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004).............................................. 20

*United States v. Velez*, No. 03 Cr. 385 (DC), 2006 WL 2621077 (S.D.N.Y. Sept. 13, 2006)
.................................................................................................................. 19

*Yarborough v. Gentry*, 540 U.S. 1 (2003)............................................................. 17

*Zafiro v. United States*, 506 U.S. 534 (1993)......................................................... 19

**Statutes**

28 U.S.C. § 2255 .......................................................................................... 10

**Other Authorities**

Individual Practices of Judge Loretta A. Preska, Southern District of New York (July 27,
    2022),                     https://www.nysd.uscourts.gov/sites/default/files/practice_
    documents/LAP%20Judge%20Preska%20Individual%20Rules%20072722.pdf ................ 11

Mayo Clinic, *Prednisone (Oral Route): Proper Use*, https://www.mayoclinic.org/drugs-
    supplements/prednisone-oral-route/proper-use/drg-20075269 (last visited June 13,
    2023) ................................................................................................... 14

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Reza Olangian's petition to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (Dkts. 167, 181).[1]  Over the course of several months in 2012, Olangian sought to obtain anti-aircraft missiles for the Iranian government in violation of United States law.  In November 2016, following a three-week trial, Olangian was convicted of conspiring to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), and 3238; attempting to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), 3238, and 2; conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 3238; and attempting to violate IEEPA, in violation of 50 U.S.C. § 1705 and 18 U.S.C. §§ 3238 and 2.  This Court sentenced Olangian to 25 years' imprisonment.

Olangian argues that he is entitled to a new trial because his trial attorney was ineffective in: (1) preparing for trial, including by failing to properly prepare Olangian for cross-examination; (2) failing to seek a continuance for Olangian's allegedly adverse reaction to a prescription; (3) failing to offer certain evidence, including evidence allegedly corroborating the argument that Olangian did not intend to carry through with the arms deals and that he hated the Iranian regime; (4) failing to point out in closing argument that there was no proof that Olangian had $15 million

---

[1] Unless otherwise indicated, "Dkt." refers to the criminal docket, 12 Cr. 798 (LAP); "Pet." refers to Olangian's initial *pro se* Section 2255 motion (Dkt. 167); "Supp. Mem." refers to Olangian's subsequent Section 2255 motion filed by counsel (Dkt. 182); "Olangian Decl." refers to Olangian's declaration, filed with his subsequent Section 2255 motion (Dkt. 181-1); "Tr." refers to the trial transcript; "Sent Tr." refers to the transcript of the March 14, 2018 sentencing; and "PSR" refers to the March 16, 2018 amended Presentence Investigation Report prepared by the United States Probation Office in connection with Olangian's sentencing.

for an arms deal; (5) failing to file a motion *in limine* to preclude testimony about Olangian's previous, uncharged dealings with weapons-for-drug traders in Tajikistan; and (6) failing to object to the Government stating that Olangian lied in its closing argument.[2]  Olangian has fallen far short of demonstrating that his trial counsel acted in an objectively deficient manner or caused him any prejudice.  His Section 2255 petition should be denied without a hearing.

## **BACKGROUND**

### I.    **Offense Conduct**

From May through October 2012, Olangian, a dual citizen of the United States and Iran, tried to obtain anti-aircraft missiles for the Iranian government.  (Tr. 42, 44).  In May 2012, Olangian met with a confidential source, who was working at the direction of the Drug Enforcement Administration ("DEA") and testified at trial under the pseudonym Max Buchinsky. (Tr. 80, 404).  Olangian first met Buchinsky in Kiev, Ukraine, during a series of recorded meetings on May 2 and 3, 2012.  (Tr. 80-82, 94-95).  Buchinsky posed as a weapons broker from Russia, who could supply military grade weaponry and other items.  (Tr. 142, 417).  Olangian inquired about obtaining aircraft parts for Russian military aircraft and IGLA-S anti-aircraft missile systems.  (Tr. 440-42, 446-47).  Olangian and Buchinsky discussed a potential deal involving aircraft parts and IGLA-S missile systems, including the pricing of such missile systems and the logistics of their delivery to Iran.  (Tr. 447-49, 472-73).  Olangian conveyed that the parts were intended for the Iranian government, and referenced his participation in a prior, unsuccessful attempt to obtain IGLA-S missile systems for the Iranian government.  (Tr. 437, 439, 451).

---

[2] Olangian's initial *pro se* Section 2255 motion alleged additional bases for relief.  (Pet. 6-13).  But in his supplemental memorandum of law, Olangian—through counsel—clarified that he was abandoning any legal arguments not addressed in the supplement.  (Supp. Mem. 1).  As a result, this memorandum addresses only the arguments raised in Olangian's supplemental memorandum.

Following the May 2 and 3, 2012 meetings in Ukraine, Olangian continued to communicate with Buchinsky via email, telephone, and Skype regarding the sale.  Olangian discussed with Buchinsky the terms of the deal, and further clarified the quantities of materials that Olangian would purchase for transfer to Iran.  (Tr. 491-92, 510, 520-21, 540).

After several electronic communications during the summer of 2012, on August 17, 2012, Olangian and Buchinsky engaged in a Skype videoconference to discuss some of the terms of the anticipated transaction.  (Tr. 573).  During their discussion, Buchinsky showed Olangian an IGLA-S missile system.  (Tr. 595).  Olangian asked Buchinsky a number of detailed questions about the sample IGLA-S missile system, including whether the missile system had a particular type of night vision detector and how many missiles accompanied each missile system.  (Tr. 604-05, 607-08).  At the conclusion of the meeting, Olangian expressed a desire to acquire a minimum of 200 additional IGLA-S missiles if the first delivery of missiles went smoothly.  (Tr. 610).

Following the August 2012 videoconference, Olangian and Buchinsky continued to communicate about the anticipated transaction.  (Tr. 624, 633, 647).  They finalized the prices, quantities, and delivery of the requested items, including the aircraft parts and the IGLA-S missile systems.  (Tr. 628, 642).  Olangian indicated that he intended to take all of the materials across the border into Iran and had made arrangements with buyers in Iran.  (Tr. 642).

On or about October 10, 2012, Olangian traveled from Iran to Tallinn, Estonia, to meet with Buchinsky to discuss payment and delivery of the IGLA-S missile systems.  (Tr. 154-55).  Upon his arrival at the Tallinn airport, Estonian police arrested Olangian pursuant to a provisional arrest warrant.  (Tr. 156-57).

Following his arrest, Olangian waived his *Miranda* rights and spoke with DEA agents in Estonia on October 10 and 11, 2012, and again on October 31 and November 1, 2012.  (Tr. 159,

168, 190, 192).  He made multiple admissions to the DEA, including that approximately five years before his arrest, he attempted to purchase approximately 100 IGLA-S missiles for the Iranian Ministry of Defense.  (Tr. 163, 165).  Though Olangian traveled internationally and engaged in extensive negotiations about the missile deal, it was ultimately unsuccessful.  (Tr. 171-73).  Olangian also admitted that in late September 2012 and early October 2012, he attended multiple meetings in Tehran with individuals who said they were officials from the Iranian Ministry of Defense about the acquisition of aircraft and IGLA-S missiles.  (Tr. 80, 708, 723).  Finally, Olangian said that he was motivated by financial gain.  (Tr. 177, 199).

## II.    Charges

On October 19, 2012, a grand jury sitting in this District returned a four-count indictment (the "Indictment").  (Dkt. 6).  Count One charged Olangian with conspiring to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), and 3238.  Count Two charged Olangian with attempting to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), 3238, and 2.  Count Three charged Olangian with conspiring to violate IEEPA, in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 3238.  Finally, Count Four charged Olangian with attempting to violate IEEPA, in violation of 50 U.S.C. § 1705 and 18 U.S.C. §§ 3238 and 2.

## III.   Trial

Trial began on November 7, 2016.  At trial, the Government called several witnesses, including Max Buchinsky, the DEA confidential source, who testified about his communications with Olangian over the course of several months about potential anti-aircraft missile transactions.  (Tr. 404-664).  Buchinsky's testimony was corroborated by recorded calls and email correspondence between Buchinsky and Olangian.  The Government presented evidence from Olangian's electronic devices, including from his email accounts, his cellphone, and his SD card,

as well as other documents, including Olangian's passport and other travel documents, which helped show the steps Olangian took to carry out the missile transactions.  The Government also called DEA Special Agents Jeffrey Higgins and Derek Odney, who testified about Olangian's post-arrest statements and proffer statements.  Among other things, Special Agent Higgins and Odney testified that Olangian stated in some of these interviews that he engaged in these missile deals to make money.  (Tr. 177, 199, 744).  The Government then argued that Olangian engaged in the missile transactions on behalf of Iran with Buchinsky and others—and intended to go through with them—in order to line his own pockets.  (Tr. 1244-45, 1263).

The defense, on the other hand, had a different theory.  The defense argued that Olangian had not intended these deals to succeed, but rather, had engaged in these discussions as part of an attempt to expose the Iranian government's efforts to procure materials, including the surface-to-air missiles, in violation of international sanctions and United States law.  (Tr. 31-32).

The defense advanced its theory of the case through vigorous cross-examination of the Government's witnesses and through two defense witnesses.  Olangian called Dr. Patrick Clawson to testify regarding Iran's recent history, including recent protest activities in Iran.  (Tr. 837).  Olangian also testified on his own behalf.  He testified that his negotiations with Buchinsky were part of his protest activity, in that he had intended, through his actions, to expose the Iranian government's efforts to obtain weaponry and other prohibited items.  (Tr. 931-32, 935, 986-88).

On November 22, 2016, the jury returned its verdict, convicting Olangian on all counts.  Shortly thereafter, trial counsel withdrew and was replaced by Gregory Morvillo, Esq.  (Dkt. 102).

## IV.    Sentencing

On March 14, 2018, the Court held a sentencing hearing.  Olangian faced a mandatory minimum term of 25 years' imprisonment, with a Guidelines sentence of life imprisonment.  (Sent. Tr. 22-23; PSR 29-30).  Before calculating the Guidelines range, the Court found that an

obstruction of justice enhancement was appropriate because "much of Mr. Olangian's testimony was diametrically opposed to other evidence received in the case; that is, Mr. Olangian's words in his emails, on some of the recorded conversations, and as recorded in the DEA reports."  (Sent. Tr. 5-6).  "Those materials," the Court found, "showed Mr. Olangian's intention and desire to conclude these transactions for the purpose of money," which "[c]ertainly . . . qualifies for the obstruction enhancement."  (Sent. Tr. 6).

The Court sentenced Olangian to a below Guidelines sentence of 25 years' imprisonment on Counts One and Two, to run concurrently with a sentence of 20 years' imprisonment on Counts Three and Four.  (Sent. Tr. 23-24).  The Court ordered that Olangian's term of imprisonment be followed by five years of supervised release.  (Sent. Tr. 23-24).

## V.    Appeal

Following the imposition of the judgment, Olangian appealed his conviction.  He argued that his conviction should be reversed because (1) the Government improperly elicited from law enforcement witnesses their belief that Olangian was untruthful during post-arrest interviews; (2) Olangian was improperly asked during his cross-examination whether the law enforcement witnesses "made up" parts of their testimony; (3) the Court gave an improper uncalled-witness instruction; (4) he should have been permitted, under the Sixth Amendment, to consult with his counsel during his redirect examination; and (5) the Court should have granted his motion for a mistrial after a law enforcement witness testified about Olangian's previous, uncharged dealings with weapons-for-drug traders in Tajikistan—a topic also raised in Olangian's Section 2255 motion.  *United States v. Olangian*, No. 18-1123, 803 F. App'x 536, 537 (2d Cir. 2020).

The Second Circuit concluded that Olangian's arguments were without merit and affirmed his conviction.  *Olangian*, 803 F. App'x at 538.  As to Olangian's argument about testimony regarding his prior interactions with weapons-for-drugs traders, the Circuit disagreed that a mistrial

6

was warranted.  *Id.*  It explained that any error was harmless "[c]onsidered in the context of the entire trial record, along with the fact that the testimony was ultimately stricken and the district court subsequently provided a curative instruction[.]"  *Id.*

Olangian then filed a petition for certiorari.  The Supreme Court denied that petition on October 5, 2020.  *Olangian v. United States*, No. 20-5038, 131 S. Ct. 384 (2020).

## VI.   Defendant's Motion Pursuant to 28 U.S.C. § 2255

Olangian filed his initial *pro se* Section 2255 motion on October 3, 2021, *see* Pet., within the one-year statute of limitations contemplated by Section 2255, *see Rosa v. United States*, 785 F.3d 856, 857, 859 (2d Cir. 2015).  Olangian then requested that the Court provide counsel to supplement his motion.  (Dkt. 171).  The Court appointed Florian Miedel, Esq., under the Criminal Justice Act.  (Dkt. 172, 174).  Miedel evaluated Olangian's case and ultimately decided not to file a supplemental memorandum (Dkt. 177), so the Court relieved Miedel (Dkt. 178).  Olangian filed a series of extension requests, which the Court granted, extending the deadline for him to file a supplemental memorandum.  (Dkts. 170, 172, 176, 178, 180).  On October 17, 2022, Olangian, through new counsel, filed a memorandum supplementing his original Section 2255 motion. (Supp. Mem. at 1).[3]  Olangian argues that his trial counsel was ineffective in allegedly failing (1) to adequately prepare for trial, (2) to seek a continuance on the day trial began, (3) to offer certain evidence, (4) to make certain arguments in closing, (5) to move *in limine* to preclude evidence that was stricken from the record, and (6) to object to the Government's closing.  (Supp. Mem. 9-30).

---

[3] Olangian's supplemental memorandum raises additional ineffective assistance claims not included in his initial *pro se* motion.  Because the supplemental memorandum was filed with the Court's permission, the Government does not argue that these additional arguments are untimely. *See Mayard v. United States*, No. 16 Cr. 609 (LAP), 2022 WL 992835, at *2 (S.D.N.Y. Apr. 1, 2022) (granting *pro se* defendant leave to file amended motion where it was not clear that all grounds for relief were raised in the original motion).

## <u>ARGUMENT</u>

The Court should deny Olangian's petition without a hearing.  Judged under the demanding standard of review of any ineffective assistance claim, Olangian's assertion of ineffective assistance falls far short of the mark.  Although Olangian complains about counsel's preparation, there is no hard-and-fast rule about how much counsel must prepare before trial, and Olangian's defense team far surpassed any ineffectiveness bar.  Olangian's remaining allegations concern counsel's strategic decisions, such as whether to seek a continuance, offer certain evidence or make certain arguments, file certain motions, or object, and do not form the basis of a valid ineffectiveness claim.  Further, given the overwhelming evidence, Olangian has failed to affirmatively prove a reasonable probability that the outcome of the trial would have been different.

## I.     **Applicable Law**

A defendant claiming ineffective assistance of counsel must (i) show that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove prejudice" from counsel's allegedly defective performance. *Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984).  An ineffective-assistance claim fails unless the defendant carries his "heavy burden" of establishing both prongs.  *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

With respect to the first prong, to eliminate the "distorting effects of hindsight," *Strickland*, 466 U.S. at 689, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).  "Judicial scrutiny of

counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, especially where the challenged conduct pertains to trial strategy, *see, e.g.*, *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (describing strategic decisions of counsel as "virtually unchallengeable absent exceptional grounds").

To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Showing merely that counsel's errors had "some conceivable effect" on the result will not suffice because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.  "The object of an ineffectiveness claim is not to grade counsel's performance," so "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697; *see, e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (declining to address alleged deficiencies of counsel where overwhelming evidence of defendant's guilt precluded finding of prejudice); *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [the defendant], there is little reason to believe that alternative counsel would have fared any better."); *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir. 1990) (affirming district court's rejection of Sixth Amendment claim despite deficient performance of counsel "given the overwhelming evidence" of defendant's guilt).

The filing of a Section 2255 petition does not, by itself, obligate the court to conduct an evidentiary proceeding.  *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977) (filing of motion "does not entitle petitioner automatically to a hearing").  Rather, the court may summarily dismiss a Section 2255 petition where the defendant fails to raise "detailed and controverted issues of fact." *Id.*  Similarly, where the existing record "conclusively show[s] that the petitioner is

entitled to no relief," summary dismissal may be appropriate.  *Id.; see also* 28 U.S.C. § 2255; *United States v. Stantini*, 85 F.3d 9, 17 (2d Cir. 1996) (no need for further factual development because defendant failed to raise plausible ineffectiveness claim regarding attorney's performance in plea negotiations or at trial); *Hopkins v. Schillinger*, 866 F.2d 1185, 1211 (10th Cir. 1989) ("Conclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, as are contentions that in the face of the record are wholly incredible.").

## II.   Counsel's Preparation for Trial Was Not Ineffective

Olangian first argues that his counsel failed to adequately prepare for trial because (1) his lead counsel Lee Ginsburg, Esq., delegated most meetings with Olangian to his associate, Nadjia Limani, Esq., and (2) Ginsburg and Limani did not prepare him to testify because they did not "role-play" cross-examination.  Supp. Mem. at 9.  But Olangian does not demonstrate how these allegations are objectively unreasonable or how they would have changed the outcome of trial.

First, there is no "mechanical rule[]" for determining when counsel is ineffective. *Strickland*, 466 U.S. at 696.  As a result, "there is no set rule for the number of times counsel must meet with a defendant."  *Rosario v. Bennett*, No. 01 Civ. 7142 (RMB) (AJP), 2002 WL 31852827, at *29 (S.D.N.Y. Dec. 20, 2002) (collecting cases).  Courts have found that even attorneys who meet with their clients infrequently before trial—just a few meetings or a few hours—may still provide effective assistance.  *See, e.g.*, *United States ex rel. Testamark v. Vincent*, 496 F.2d 641, 642-43 (2d Cir. 1974) (denying ineffective assistance claim where attorney met with defendant twice before trial); *Byas v. Keane*, No. 97 Civ. 2789 (SAS), 1999 WL 608787, at *5 (S.D.N.Y. Aug. 12, 1999) (same).

Counsel has far exceeded that low bar in this case.  By Olangian's own admission, Ginsburg himself met with Olangian on multiple occasions.  (Olangian Decl. ¶ 2).  And Limani spent at minimum over 530 hours preparing for the defendant's trial, including meeting with the

defendant.  (Dkt. 54).  Although Olangian complains about Limani's role on his defense team, it is quite common for more senior attorneys, especially partners, to delegate important tasks to associates, who are vital members of their teams.  This kind of delegation is not unreasonable.  Far from it—it allows law firms to function and younger attorneys to develop; indeed, it is even encouraged by this Court.  *See* Individual Practices of Judge Loretta A. Preska, Southern District of New York (July 27, 2022), https://www.nysd.uscourts.gov/sites/default/files/practice_ documents/LAP%20Judge%20Preska%20Individual%20Rules%20072722.pdf  ("The Court encourages senior lawyers to allow junior lawyers the opportunity to argue in court, whether at a conference, hearing, trial, or otherwise.").

Second, even if Olangian's team did not prepare him for cross-examination through formal role playing of questions and answers, that is not objectively unreasonable.  *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer[.]).  Imposing such a strict role-play requirement would be just the kind of "mechanical rule" that *Strickland* warns against.  There is a "strong presumption" that counsel's conduct is reasonable, *Aguirre*, 912 F.2d at 560, and it is plain, even on this record, that Olangian has not rebutted that presumption.  As described above, the defense team spent hundreds of hours working on Olangian's case and meeting with him.  Their decisions about how exactly to prepare him for cross-examination fall within the "wide range of reasonable professional assistance."  *Id.*

Last, Olangian has not shown prejudice, because he has failed to show how additional preparation would have changed the outcome of the trial.  Nor could he.  The Government's case was overwhelming, and included extensive documentary evidence of the steps Olangian took to effectuate the anti-aircraft missile transactions, as well as Olangian's admission that he had

engaged in similar transactions before and that he was involved in such transactions at least in part to make money. *See Steele v. United States*, No. 02 Cr. 629 (JSR) (AJP), 2005 WL 704868, at *10 (S.D.N.Y. Mar. 29, 2005) (denying ineffective assistance claim where defendant "cannot show that had defense counsel spent more than three and one half hours with him, the outcome at trial would have been different"); *Rosario*, 2002 WL 31852827, at *31 (noting that in the face of overwhelming evidence, including the defendant's confession, it was "highly unlikely that additional communication between Rosario and his counsel would have changed the trial outcome.").

## III.   Counsel's Decision Not to Seek a Continuance Was Not Ineffective

Olangian next argues that trial counsel was ineffective in failing to ask for a continuance on the first day of trial because Olangian had taken too much medication for his colitis, which can cause inflammation in the intestines.  (Supp. Mem. 10-12).  Olangian states that he "regularly suffered from severe ulcerative colitis," which he treated by taking prednisone.  (Supp. Mem. 10). Usually, he would take 40 or 30 mgs of prednisone, which tapered off in 5 mg increments over the next five or seven days.  (Supp. Mem. 10).  But he alleges that on November 2, 2016, he unknowingly received a dosage of 80 mg pills, which tapered down by 10 mg each day.  (Supp. Mem. 10).  Olangian claims that the medication caused him to have difficulty sleeping and suffer from mood swings and high anxiety.  (Supp. Mem. 10).  Olangian states that on November 7, the first day of trial, he asked his counsel to request a continuance, which counsel did not do.  (Supp. Mem. 11).  Olangian claims that the medication caused him to appear out of control and less credible on the stand.  (Supp. Mem. 11).  Olangian argues that counsel had "no 'strategic' reason" for failing to move for a continuance.  (Supp. Mem. 12).

Counsel's decision not to seek a continuance was "a reasonable exercise of professional judgment in light of the circumstances." *United States v. Prince*, 110 F.3d 921, 926 (2d Cir. 1997).

Further, there is no indication that the Court would have granted such a last-minute continuance request.  Olangian's case had been pending for four years, and the Court had already granted five adjournments of the trial date, which had pushed the trial from June 15, 2015, to November 7, 2016.  (*See, e.g.*, Dkts. 36, 42, 49); *see also Donato v. United States*, No. 09 Civ. 5617 (NGG), 2012 WL 4328368, at *7 (E.D.N.Y. Sept. 20, 2012) (denying ineffective assistance claim for failure to seek continuance where defendant's case had been pending for over two years).  Olangian has offered "no reason for why he believes that the court would have granted a continuance," given that jury selection was or would soon be underway.  *Donato*, 2012 WL 4328368, at *7.  The Court, after all, has "broad discretion . . . on the matter of continuances" and is not required to grant even a health-related continuance.  *United States v. Barbarino*, 612 F. App'x 624, 626 (2d Cir. 2015) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)) (affirming district court's denial of adjournment based on "serious health issues").  Counsel likely considered all of these factors when he reasonably decided not to seek a continuance, and Olangian has not shown that counsel's decision not to request a continuance was unreasonable under prevailing professional norms.

Further, Olangian has failed to show that a continuance would have changed the outcome of the case.  By Olangian's own calculation, four days into taking this round of prednisone—one day before trial and ten days before he first took the stand—he was back to his normal dosage of medication.[4]  He has presented no evidence that that any emotions he felt on the stand were due to consuming higher than normal amounts of medication nearly two weeks before.

---

[4] The Mayo Clinic, an authority cited by the defendant, advises that adults can, at first, take up to 60 mg of prednisone at a time.  Mayo Clinic, *Prednisone (Oral Route): Proper Use*, https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/proper-use/drg-20075269 (last visited June 13, 2023).  Olangian took just two days' worth of medication in excess of this recommendation.

**IV.    Counsel's Decision Not to Offer Certain Evidence Was Not Ineffective**

Olangian next asserts that trial counsel was ineffective in choosing not to offer certain evidence that supported Olangian's defense that he never intended to go through with the missile transactions.  (Supp. Mem. 12-23).  Specifically, Olangian wanted counsel to introduce specific evidence that (1) he did not intend to go to Russia on October 13, 2012, to complete an aircraft sale with Garbis Ingiliz, as the Government had argued, and (2) Olangian hated the Iranian government.  (Supp. Mem. 12-23).  But counsel's decisions not to introduce or draw attention to such evidence was a permissible strategy choice.  *See Strickland*, 466 U.S. at 699.  These strategic choices were not objectively unreasonable and would not have changed the outcome of the trial, especially given the other evidence.

First, Olangian claims that his counsel should have presented evidence that his passport lacked a Russian visa when he was arrested on October 10, 2012, and that he sent a text on October 6, 2012, to "Esmaeili," a man who was supposedly financing the aircraft sale in Russia on October 13, 2012.  (Supp. Mem. 13-14).  Olangian argues that because his American passport, which was in evidence, did not have a Russian visa, he could not have actually intended to travel to Russia three days after his arrest—and thus did not intend to complete any missile sale.  (Supp. Mem. 14).  But the fact that counsel did not point out the lack of a visa is not objectively unreasonable.  Olangian still had at least a day to make travel arrangements, and as Olangian himself points out, he also had an Iranian passport, which may or may not have had a visa.[5]  (Supp.

_____

[5] Olangian asserts that neither the airline nor Russian immigration would have allowed him to switch from traveling with his American passport, which he used to get into Estonia, to traveling with his Iranian passport.  (Olangian Decl. at 7).  But he cites no supporting evidence, and simply claims *ipse dixit* that it would make no sense for him to switch passports.  (Olangian Decl. at 7).  But he may very well have had an interest in using different passports when traveling to conduct transactions that he admits are illegal.

14

Mem. 14).  Further, and more devastating, Olangian himself testified that he in fact intended to go to Moscow the day after his arrest to meet with Ingiliz.  (Tr. 1066 (Olangian: "I traveled to Estonia on the 10th.  I had a schedule to meet Garbis three or four days later in Moscow[.]"); Tr. 1075 (Government: "When you arrived in Estonia you had no idea that you were going to be arrested at that point, right?"  Olangian: "Yes, I had no idea."  Government: "And you testified a little while ago that you were planning to travel to Moscow the following day, right?"  Olangian: "Yes."  Government: "You had made arrangements to meet with Garbis Ingiliz the following day?"  Olangian: "Yes."  Government: "And the reason for that meeting you testified was to finalize negotiations regarding a contract for Airbus A300-A600, right?"   Olangian: "A deal, quote/unquote.")).

The same is true of the text to Esmaeili.  That text reads, "What can this action of yours possibly be called?  Breach of promise, deceipt [*sic*]. . . you asked me if I trusted you?  In your opinion, can a person with these types of traits be trusted?"  (Dkt. 181-7).  Olangian claims that this text, which was sent four days before he left for Estonia and was arrested, was a "pretext"— he was acting if he were angry with Esmaeili in order to have an excuse not to follow through with the Airbus transaction in Moscow.  (Supp. Mem. 16).  But there were sound strategic reasons for counsel not to call attention to this text.  On its face, the text seems to show Olangian's emotional investment in the success of the deal.  Plus, the text was followed by a request for Esmaeili to contact him.  And rather than testifying that he (Olangian) called off the deal then, he instead said he planned to go to Moscow to meet with Ingiliz about the transaction—a plan that does not make sense if Olangian never intended to go to Russia or complete the transaction.  (*See* Tr. 1066, 1075).

Further, Olangian has not demonstrated any prejudice from counsel's decision not to focus on the passport or the text message.  That is because there was not any.  Given Olangian's other

options for a visa and his own testimony that he planned to go to Moscow to meet with Ingiliz regarding the Airbus deal, pointing to these minor, supposedly contradictory pieces of evidence would not have saved Olangian from a conviction.

Second, Olangian asserts that counsel should have introduced particular evidence demonstrating his hatred of the Iranian regime, including photographs and video of Olangian and his family participating in the Green Movement protests, a photograph of Olangian and his brother before the brother died of injuries from a stabbing at the hands of the Iranian militia, and records from Olangian's A-file that allegedly contained proof of his family's persecution in Iran.  (Supp. Mem. 22).  But counsel *did* introduce evidence of Olangian's family's political suffering and physical injuries imposed by the Iranian authorities.  (*See, e.g.*, Tr. 872-78 (Olangian testifying to family's political history, including his brother's stabbing and death); Tr. 947-59 (Olangian testifying about the protests he participated in and injuries suffered, including through photographs)).  Counsel even called an expert to testify about Iran's political history to give context to Olangian's alleged motive to expose the Iranian government.  (*See* Tr. 835).  And counsel then argued that both Olangian's family's personal history and the general climate in Iran provided a reason why Olangian would have done this.  (*See, e.g.*, Tr. 28, 31, 1334).

This evidence would therefore have been cumulative, and Olangian has not shown otherwise.  *See, e.g.*, *Strickland*, 466 U.S. at 699 (finding that counsel's "strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more . . . evidence than was already in hand was likewise reasonable"); *Luciano*, 158 F.3d at 660 (denying ineffective assistance claim where counsel did not call an additional corroborative witness where "counsel might well have regarded the testimony as unnecessarily cumulative").  Introducing more

evidence on these same points "would barely have altered" the picture before the jury and thus would not have made a difference in the outcome.  *Strickland*, 466 U.S. at 700.

## V.     Counsel's Decision Not to Argue that There Was Not Proof of $15 Million in a Bank Account in Turkey Was Not Ineffective

Olangian next discusses an email that he sent Ingiliz, in which Olangian stated that he was "in the Tehran airport leaving for Moscow into Estonia" and had "$15 million in a bank account ready for deposit toward the purchase" of aircraft.  (Supp. Mem. 23).  He states that he did not have $15 million in a Turkish bank account and asserts that his counsel should have pointed the Government's lack of proof in closing to support the claim that Olangian never intended to go through with the transaction on October 13, 2012. (Supp. Mem. 23-24).  But "[a] lawyer's decision not to pursue [an argument] does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." *Dupont v. United States*, 224 F. App'x 80, 82 (2d Cir. 2007) (internal quotation marks omitted).

There was reasonable justification here.  The focus of counsel's closing argument was that Olangian never wanted these anti-air missiles transactions to happen.  (*See, e.g.*, Tr. 1338).  In support of this argument, counsel pointed to various proof that the Government lacked, including that Olangian had not gone through with even one transaction.  (*See, e.g.*, Tr. 1339).  That counsel did not also stress that the Government lacked proof of other points is of no moment.  As the Supreme Court has explained, especially in regard to closing argument, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Olangian also has not made out prejudice, because there is "no 'reasonable probability' that a better closing argument without these defects would have made a significant difference." *Smith v. Spisak*, 558 U.S. 139, 151 (2010).  Counsel still would have had to face the overwhelming

evidence that Olangian participated in the arms negotiations, including his own emails, recorded conversations, and even an SD card that he failed to mention to authorities, and Olangian's admissions that he participated in these transactions for financial gain.  The latter was corroborated by, among other things, Olangian's focus on negotiating price and the logistics of how to get the weapons to Iran, as well as his choices about what transactions to pursue at the expense of others. (*See* Tr. 1274-85).  Changes to counsel's closing would not have made a difference.

## VI.    Counsel's Decision Not to File a Motion *in Limine* to Preclude Olangian's Dealings with Weapons-for-Drug Traders Was Not Ineffective

Olangian next claims that his counsel should have filed a motion *in limine* to preclude testimony about Olangian's supposed dealings with a group in Tajikstan that was trading weapons for drugs.  (Supp. Mem. 25-26).  But a motion *in limine* was unnecessary to keep out this evidence, and there is no hard-and-fast rule that counsel must file motions to preclude.

These dealings came up during Special Agent Odney's testimony.  Specifically, the Government questioned Special Agent Odney about Olangian's post-arrest interview in which he mentioned a prior missile deal.  (*See* Tr. 713).  In response, Special Agent Odney stated that Olangian had said that he had traveled to Tajikstan "to attempt to do a drug deal of some sort where he was going to trade heroin for AK-47s."  (Tr. 713).  Upon hearing this answer, defense counsel immediately asked for a side bar and explained to the Court that he believed the Government had represented before trial that it would not elicit testimony about this weapons deal.  (Tr. 714).  After some back-and-forth, the Government agreed to have the question and answer stricken.  (Tr. 714-16).  The Court then instructed the jury that the question and answer would "play no part in your deliberations."  (Tr. 718).

Under these circumstances, it was not unreasonable for defense counsel to choose not to file a motion *in limine*.  In fact, in light of the parties' discussions before trial, "[n]o in limine

18

motion was necessary . . . because there was nothing in advance of trial to suggest that the Government would be making references to" the weapons-for-drugs traders.  *United States v. Velez*, No. 03 Cr. 385 (DC), 2006 WL 2621077, at *8 (S.D.N.Y. Sept. 13, 2006).  That defense counsel chose to engage in discussions with the Government rather than file a motion *in limine* litigating the issue was a strategic decision.  *Cf. United States v. Price*, 443 F. App'x 576, 579 (2d Cir. 2011) (rejecting claim that failure to file motion *in limine* to preclude defendant's nickname ("Crime") was ineffective where defense counsel instead chose to ask potential jurors about the nickname and exclude them accordingly).

In addition, filing a motion *in limine* would not have altered the outcome because the Court's instruction to the jury more than sufficed to eliminate any possible prejudice that ensued to Olangian from the stray reference to heroin and AK-47s.  There is no reason to believe that the jury in this case was incapable of following the Court's instruction to disregard the stricken testimony.  *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987); *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) ("[J]uries are presumed to follow their instructions." (internal quotation marks and citation omitted)).  That is especially true given the Court's reminders throughout the trial and during the final jury instructions that stricken testimony was not to play any role in their deliberations.  (*See, e.g.*, Tr. 1093, 1394); *see also Olangian*, 803 F. App'x at 38 (holding that any error from eliciting this testimony was harmless).

## VII.    Counsel's Decision Not to Object to the Government's Closing Was Not Ineffective

Finally, Olangian argues that his counsel should have objected to the Government's statements in closing that the defendant had "lied."  (Supp. Mem. 27 (citing Tr. 1247, 1253, 1297, 1313)).  Although the Second Circuit has been critical of the Government's use of the word "lie" in addressing the jury, *United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004), it is "rare" that any "improper comments" to the jury warrant a new trial or other relief after conviction, *see United*

19

*States v. Bonventre*, 646 F. App'x 73, 87 (2d Cir. 2016) (citation omitted).  This is not one of those rare cases, especially considering that Olangian himself testified that "if I'm guilty of anything, I'm guilty of lying" in reference to his statements to law enforcement. (Tr. 1098).   Because "decision such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so," counsel's decision not to object here does not overcome the presumption of effectiveness.  *Cohen*, 427 F.3d at 170 (internal quotation marks and citations omitted).  And Olangian has again failed to show that any objection would reasonably have changed the outcome given the overwhelming evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Olangian's petition without a hearing.


Dated: New York, New York
      June 15, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


By:                                   
                                        Madison Reddick Smyser
                                        Assistant United States Attorney
                                        (212) 637-2381

20